## NATIONAL CASH REGISTER COMPANY, Appellant v. EVATT, Tax Commissioner, Appellee.

Board of Tax Appeals

Nos. 5875, 5876, 5877, 5878.   Decided November 8, 1944.

Graydon, Head and Ritchey, Cincinnati, for appellant.
Hon. Thomas J. Herbert, Attorney General, Columbus, and Perry L. Graham, Assistant Attorney General, Columbus, for appellee.

This cause came on for hearing on four appeals of The National Cash Register Company from franchise tax assessments made against it by the tax commissioner, appeal No.

5875 being for the year 1936, No. 5876 for the year 1937, No. 5877 for the year 1938, and No. 5878 for the year 1939. Said cause was heard and submitted upon the transcript of proceedings before the tax commissioner, the evidence and stipulations and briefs of counsel. By agreement said appeals were heard together and treated as one cause.

The errors complained of in all the appeals are briefly as follows: The tax commissioner in computing the numerator of the property fraction in determining the base for the franchise tax, found that certain deposits and certain customers' notes or accounts receivable which appellant had allocated outside of Ohio had their situs in Ohio for taxation; that certain advances made by appellant to its sales agents, certain amounts due appellant from its foreign agents, and certain investments in its foreign companies and branches had their situs in Ohio, none of which items were reported in appellant's returns for said years as having a situs in this state. Appellant further claimed in the notice of appeal that the tax commissioner erred in his allocation of a part of appellant's total business to Ohio business in computing the numerator of the business fraction. With respect to the assessment for the year 1939 appellant also claims that the tax commissioner erred in disallowing a reserve set up by appellant for dividends owing to it from its Berlin subsidiary.

Appellant is a corporation organized under the laws of Maryland with its principal place of business, as designated in the articles of incorporation, at Baltimore. The manufacturing plant and executive and accounting offices are located in Dayton, Ohio. It is engaged in the manufacture and sale of cash registers, accounting machines, files, etc. In the United States it conducted its sales through sales agents, and in 1935 in one branch office in New York, in 1936 and 1937 four branch offices located in New York, Philadelphia, San Francisco and Washington, D. C., and in 1938 it opened six more in Boston, Chicago, Cleveland, Detroit, Pittsburgh, and St. Louis. All agents operate under a standard form of contract. Under this contract orders for products must be taken upon the printed form furnished by appellant. When an order is taken the same is not binding upon the appellant until it is accepted by it. Said contract also provides:

"Said sales agent agrees that the Company shall have, either before or after the termination of the agency, full control of and discretion as to the collection, adjustment or compromise of any or all accounts for sales made by him of

National Products, but if the Company should request said sales agent to make any collection, or to obtain possession of any National Products or other property, whether the same relates to a sale made by said sales agent or any agent that preceded him in said territory, said sales agent agrees to do so promptly. Said sales agent agrees. that the Company shall determine as to taking or not taking a lien upon National Products sold by said sales agent, and that the Company shall not be liable to said sales agent for any loss of commission, or other claim, by reason of failure to take such liens, or by reason of any compromise or adjustment of any account or accounts or notes for National Products sold by said sales agent, or any failure for any reason to collect all or any part of any such account or notes.

"Said sales agent agrees to remit daily to the Company, in the mannner prescribed by its Treasurer, or to deposit daily in a bank designated by its Treasurer, all money, checks and drafts received by him for the Company, including money received for repair parts and supplies sold, and that in no event will he use any money collected for the Company to defray the expenses of his agency, or for any other purpose, or deposit the same in any bank to his own credit. If inadvertently, a check or draft for an amount owing the Company is made payable to said sales agent, he will indorse it to the Company, and if said sales agent should neglect to indorse any such check or draft, the Company is authorized to make such indorsement for him in his name. The Company reserves the right to refuse to accept said sales agent's personal check in payment of any amount due it. Said sales agent agrees that he will not, under any circumstances, sign the Company's name to a receipt in full for a customer's account, but instead that he will receipt to the customer for the amount paid only, in his own name as sales agent, and, if desired, the Company will forward an official receipt direct to the purchaser for all amounts that may be credited to his account."

Such contract does not apply to the branch offices, which are operated by branch managers. The agents are paid solely on a commission basis and the office managers are credited for commission on sales at the same rate as agents. Both the agencies and branch offices attempt to carry a full inventory machines of standard types, the title to which machines remain in the appellant until sold, being shipped on consignment to the agency or branch. The method of selling

may be described as follows: The salesman or agent contacts the customer and demonstrates the machines, takes the order, which is subject to acceptance by the appellant. If the sale is made by a salesman the order is turned over to the agency where he is employed. If the agency has that type of machine so ordered in its consignment stock the machine is immediately delivered to the customer. The installment sales are payable from twelve to thirty-six months. If there is no machine of the type desired in stock the agent sends the order to Dayton where the order is filled and the machine is shipped to the agent, who delivers and installs it. If it is to be a specially built machine the order is sent to Dayton, and if the machine can be built the appellant quotes the price to the agent, who quotes it to the customer. The same procedure is followed with respect to the branches. Appellant accepts all orders without investigation of the credit of the customer. The Dayton office prepares the installment due notices and sends them to the agents or branches, who deliver them to the customers. The installments are payable at the agencies or branches. If the sale is a cash sale the agent collects the amount thereof. Moneys collected by agents and branches are deposited in local banks and a duplicate deposit slip is sent to the Dayton office. The agents and branches have no authority to make any withdrawals from such deposits. The agents may repossess machines without the approval of the appellant.

1. As to the accounts receivable due to appellant from customers, the following shows the amounts of such sales made by agents in Ohio and also sales made by agents outside of Ohio:

**FOR THE YEAR 1936**

| | |
|---|---|
| Ohio sales | $ 753,863.19 |
| Sales outside of Ohio | 10,849,422.40 |
| Total | $11,603,285.59 |

**FOR THE YEAR 1937**

| | |
|---|---|
| Ohio sales | $ 907,851.60 |
| Sales outside of Ohio | 13,350,066.77 |
| Total | $14,257,918.37 |

**FOR THE YEAR 1938**

| | |
|---|---|
| Ohio sales | $ 1,031,733.21 |
| Sales outside of Ohio | 13,613,044.95 |
| Total | $14,644,778.16 |

## FOR THE YEAR 1939

| | |
|---|---:|
| Ohio sales | $    928,699.84 |
| Sales outside of Ohio | 12,347,664.59 |
| Total | $13,276,364.43 |

The following shows the amounts of consigned sales; that is, sales made from stocks located outside of Ohio and for which intallment notes were given:   For the year 1936, $3,-719,399.40; for the year 1937, $4,773,721.35; for the year 1938, $4,597,719.31; for the year 1939, $4,540,183.66.

The following are the amounts of accounts receivable from shipment sales shipped from the Dayton plant to agents or branches outside of Ohio:

### NOTES MATURING WITHIN ONE YEAR

| | |
|---|---:|
| For the year 1936 | $2,963,308.16 |
| For the year 1937 | 3,846,011.54 |
| For the year 1938 | 4,408,292.68 |
| For the year 1939 | 3,597,329.54 |

### NOTES MATURING ONE YEAR OR MORE

| | |
|---|---:|
| For the year 1936 | 4,166,714.84 |
| For the year 1937 | 4,730,333.88 |
| For the year 1938 | 4,607,032.96 |
| For the year 1939 | 4,210,151.39 |

It is conceded that the accounts receivable above set forth arising from sales made by Ohio agents have a situs in Ohio. There remains to determine which, if any, of the accounts receivable above set forth arising from sales made by agents outside of Ohio have a situs in this state for taxation purposes. §5498, GC, provides in part as follows:

"In determining the amount or value of intangible property, including capital investments, owned or used by this state by either a domestic or foreign corporation the commission (commissioner) shall be guided by the provisions of §5328-1 and 5328-2 of the General Code except that investments in the capital stock of subsidiary corporations at least fifty-one per centum of whose common stock is owned by the reporting corporation shall be allocated in and out of the state in accordance with the value of physical property in and out of the state representing such investments."

Section 5328-1, GC reads in part as follows:

"Property of the kinds and classes mentioned in §5328-2 of the   General   Code, used in and arising out of business

transacted in this state by, for or on behalf of a non-resident person, other than a foreign insurance company as defined in §5414-8 **of the GC,** and non-withdrawable shares of stock of financial institutions and dealers in intangibles located in this state shall be subject to taxation;"

Under this letter section it is clear that to be taxable in this state such accounts receivable owned by a nonresident must not only have been used in business transacted in this state, but also must have arisen out of business transacted in Ohio. With respect to the first of these two requirements, the term "used", as defined in §5325-1, GC, is as follows:

"Moneys, deposits, investments, accounts receivable and prepaid items, and other taxable intangibles shall be considered to be 'used' when they or the avails thereof are being applied, or are intended to be applied in the conduct of the business, whether in this state or elsewhere."

The Supreme Court in construing the provisions of §5328-1 GC, with reference to residents' accounts receivable used in and arising out of business transacted outside of Ohio shall not be subject to taxation, held that it is sufficient if the avails of such accounts receivable are used **partly** in such out-of-state business, the third paragraph of the syllabus in the **Haverfield Company v Evatt, 143 Oh St 58,** reading as follows:

" 'Accounts receivable' arising from business transacted in a state other than Ohio are 'used in business' within the provisions of §5325-1, **GC,** and therefore exempt from taxation in this state under the provisions of §5328-1 and §5328-2, **GC,** where the avails of such 'accounts receivable' are used partly in payment of the expenses of the operation of such out-of-state business, and the balances, if any, remitted to and used by the Ohio corporation in its regular course of business, whether in this state or elsewhere."

Consequently, with reference to nonresidents it is sufficient to make accounts receivable of a nonresident taxable if they arise from business transacted in Ohio and the avails thereof are used partly in payment of the expenses of the operation of the owner's business in Ohio. In the present case the evidence offered by the appellant shows clearly that

a large part of the avails of the accounts receivable in question were applied or intended to be applied in the conduct of its business in Ohio. Deposits which were made in local banks by agents of money received from customers wherever such agents were located, were immediately withdrawn and placed in appellant's banks to be applied in the conduct of its entire business wherever located. Since its main offices and its manufacturing plants wherein thousands of persons were employed and where money was expended for the purchase of the necessary machinery and materials for the manufacture of its products were located in Ohio, it cannot be doubted that most of the avails of such accounts receivable were used in the conduct of its business here. The Board, therefore, finds that all of said accounts receivable were used in business transacted in this state.

With respect to the other requirements, §5328-2, GC provides in part as follows:

"Property of the kinds and classes herein mentioned, when used in business, shall be considered to arise out of business transacted in a state other than that in which the owner thereof resides in the cases and under the circumstances following:

"In the case of accounts receivable, when resulting from the sale of property sold by an agent having an office in such other state or from a stock of goods maintained therein, or from services performed by an officer, agent or employe connected with, sent from, or reporting to any officer or at any office located in such other state."

With reference to the so-called consignment sales, the record shows that the agents and branches attempted to keep on hand at the agencies and branches a complete inventory of the standard types of products, which were shipped to them by the appellant on consignment. When products were sold, deliveries were immediately made from the stock on hand wherever possible. Said products were not sold by any agents having an office in Ohio or from a stock maintained here. Therefore, the Board finds that the accounts receivable arising from these consignment sales do not have an Ohio situs for purposes of taxation and that in determining the base upon which the franchise fee for the years in question is computed, the value thereof, as above set forth for said years, should not be included in determining the fair value of appellant's property owned or used by it in Ohio;

and in this respect the action of the tax commissioner is reversed.

As to the so-called shipment sales, the record shows that when a customer ordered a product which the agent or branch did not have in stock or if a product was to be specially built, the agent or branch sent such order to appellant's place of business in Dayton where it was filled and the product was shipped by appellant to such agent or branch. The record shows that there were times when the appellant ordered products shipped from some other agency, but there is no evidence of any amount thereof. The Board finds that such products were sold from a stock of goods maintained in Ohio and, therefore, do have an Ohio situs for the purpose of taxation, and that the value of the accounts receivable resulting therefrom should be included in determing the fair value of all of appellant's property owned or used by it in Ohio, and in this respect the action of the tax commissioner is affirmed.

The appellant makes the suggestion that these accounts receivable may be considered investments rather than accounts receivable since the amounts due from customers on installment sales are evidenced by notes. **Section 5323, GC** in defining investments includes the following: "Interest bearing obligations for the payment of money, such as * * * notes;". There is no evidence that these notes bear interest. The notes themselves contain no provision for the payment of interest on the amount thereof. The notices of installments do contain this provision: "Prepayment of your account in full will entitle you to a rebate of the exact amount of the unused carrying charge." Apparently appellant, in the case of an installment sale, adds to the selling price a charge to pay for the expense of carrying the account, the total of which becomes the principal of the note, and no interest is charged on the amount of the note. These notes are simply evidences of amounts due the appellant from sales of its products, and, in the opinion of the Board, cannot be considered investments within the meaning of §5323, GC.

The Board, therefore, finds that the values of the accounts receivable owned or used by the appellant in Ohio for the years in question are as follows: For the year 1936, $7,883,886.19; for the year 1937, $9,484,197.02; for the year 1938, $10,047,058.85; for the year 1939, $8,736,180.77.

2. As to deposits, appellant in its return allocated to Ohio its cash and deposits in Ohio and allocated outside of the

state deposits located in other states. Appellant has bank accounts in Dayton, New York, Chicago, San Francisco, and courtesy accounts in some other banks. The amounts of such deposits for the years in question are as follows:

| OHIO CASH AND DEPOSITS | DEPOSITS OUTSIDE OF OHIO | TOTAL |
|---|---|---|
| 1935 $335,839.70 | $1,346,291.46 | $1,682,131.16 |
| 1936 824,691.77 | 1,030,618.04 | 1,885,309.81 |
| 1937 798,505.39 | 949,061.35 | 1,747,566.74 |
| 1938 676,818.53 | 1,769,365.55 | 2,446,184.08 |

Deposits in local banks made by agents and branches are immediately withdrawn and deposited in their co-called principal banks. Such deposits are made in the particular banks where appellant anticipates withdrawals and appellant tries to alternate as much as possible from one bank to the other. Withdrawals for the payment of expenses are generally made from banks with reference to their location. For instance, agents' commissions due agents on the Pacific coast are paid from the deposit at the San Francisco bank. There can be no question that these deposits are used in business transacted in Ohio within the meaning of §5325-1, GC.

Section 5328-2, GC provides as to deposits as follows:

"Property of the kinds and classes herein mentioned, when used in business, shall be considered to arise out of business transacted in a state other than that in which the owner thereof resides in the cases and under the circumstances following: * * *

"In the case of deposits (other than such as are used in business outside of such other state), when withdrawable in the course of such business by an officer or agent having an office in such other state; but deposits representing general reserves or balances of the owner thereof, maintained for the purpose of his entire business wherever transacted, shall be considered located in the state wherein the owner resides, if an individual, or wherein its actual principal executive office is situated, if a partnership or association, or under whose laws it is organized, if a corporation, by whomsoever they may be withdrawable."

Said deposits outside of Ohio are withdrawable in the course of appellant's business by an officer having an office in this state and thus have an Ohio situs unless they represent general reserves or balances maintained for the purpose

of appellant's entire business. Deposits in and withdrawals from such bank accounts were made almost daily in the ordinary course of appellant's business to meet its daily needs. In C. F. Kettering, Inc., v Evatt, Docket No. 5798, this Board said:

"Apparently the word 'balances', as used in §5328-2 **GC,** means balances in the nature of a reserve which are set up and **maintained** for future needs and contingencies in the business, and is not meant to include cash in ordinary bank accounts, which is used almost daily for the current needs of the business, the balances of which are constantly fluctuating. It is significant that the legislature used the word 'maintained'. The word 'maintain' has been defined to mean to continue, to hold in an existing sale or condition, to hold or preserve in any particular state or condition, to keep from change, to keep up, or to preserve or keep from lapsing or declining. 38 C. J. 335."

The Board is of the opinion that said deposits do not constitute general reserves or balances within the meaning of this statute and finds that all of said deposits have a situs in Ohio and the action of the tax commissioner in this respect is affirmed.

3. The next two alleged errors of the tax commissioner set forth in the notices of appeal are the findings of the tax commissioner that certain advances made by the appellant to its United States agents and the amounts due from its foreign agents have a situs in Ohio. Appellant now apparently concedes these credits have an Ohio situs, but makes some claim that the reserves which it had set up against the above advances, which were allowed by the tax commissioner, were not deducted in determining the numerator of the property fraction. The proof fails to substantiate this claim and with respect to these two alleged errors the action of the tax commissioner is affirmed.

4. The next assigned error is that the tax commissioner in each year allocated certain of appellant's investments in its foreign companies and branches to Ohio. We will consider along with this item the disallowance by the tax commissioner of reserves which appellant set up and designated as intercompany profit and interbranch profit which are contained in appellant's assigned error No. 6. The evidence shows that when appellant's products are shipped to its foreign companies and branches on a consignment basis it sets up on its books the net price thereof to appellant designated as current accounts receivable, and the profit which would be

realized therefrom by appellant when and if the products are sold is set up as intercompany profit or interbranch profit. When such products are sold entries offsetting the charges to current accounts receivable and intercompany profit and interbranch profit are made and the net prices of products so sold are set up as actual accounts receivable. Appellant concedes that the accounts receivable representing machines which have been sold are allocable to Ohio. The amounts of these are set forth by the appellant as follows:

1935 - - - - - $2,201,623.46
1936 - - - - - 2,062,574.74
1937 - - - - - 1,627,722.42
1938 - - - - - 962,817.81

The tax commissioner allocated to Ohio the total amounts of current accounts receivable which included both the net price of machines actually sold and the net price of machines unsold and in possession of the foreign companies and branches on consignment. The amounts so allocated by the tax commissioner are as follows:

1935 - - - - - $3,844,758.81
1936 - - - - - 4,069,546.74
1937 - - - - - 4,137,232.61
1938 - - - - - 2,598,041.21

The Board is of the opinion that since the title to the products shipped on consignment to the appellant's foreign companies and branches remains in the appellant until sold by them, that portion of the total current accounts receivable which represents the net price to appellant of products unsold and in possession of such foreign companies and branches constitutes the value of tangible property owned by the appellant located outside of Ohio and, therefore, is not taxable in Ohio and it can not lawfully be included in determining the value of appellant's investments in its foreign companies and branches. Likewise, since the evidence shows that the amounts set up in the books designated as intercompany and interbranch profit which represent no profit realized on machines shipped to such foreign agents, but profit which it may earn if and when such machines are sold, can not be considered in determining the net worth of such investments, but should be deducted therefrom. The amounts of the net price of the machines shipped on consignment and unsold are as follows:

1935 - - - - - $1,643,135.35
1936 - - - - - 2,006,972.00
1937 - - - - - 2,509,510.19
1938 - - - - - 1,635,223.40

The amounts of the items designated as intercompany and interbranch profit are as follows:

|      | INTER-COMPANY PROFIT | INTER-BRANCH PROFIT |
|------|---------------------|---------------------|
| 1935 | $ 585,734.36        | $37,864.73          |
| 1936 | 752,366.34          | 67,408.42           |
| 1937 | 1,245,142.38        | 9,316.64            |
| 1938 | 992,043.25          | 14,484.15           |

In these respects the action of the tax commissioner is reversed.

5. Appellant further complains of the disallowance by the tax commissioner of a reserve which it had set up each year on its balance sheet as against "customers' accounts receivable (Sp.)". The reserve so disallowed for each of the years in question amounts to $97,000.00. From appellant's own designation thereof on its balance sheets the tax commissioner naturally considered it as a reserve for losses on accounts receivable due from its Spanish company, and since he found that the appellant carried a large reserve for losses in Spain he disallowed the same. However, the evidence shows that these reserves had nothing whatever to do with the Spanish company, but were set up for losses on customers' accounts resulting from sales other than installment sales, to wit, cash sales which were payable in thirty days. The evidence shows that in 1933 and 1934 the reserves set up by appellant were less than the actual losses in such years and that likewise in the years 1935, 1936, 1937 and 1938 the losses exceeded the amounts of said reserves. Appellant made no explanation of the designation it made in its balance sheet with respect to these reserves, but there is nothing in the record to show that the testimony offered on behalf of the appellant was erroneous. The Board, therefore, finds these reserves are proper and reasonable and should be allowed; and in this respect the action of the tax commissioner is reversed.

6. Appellant also complains of the disallowance by the tax commissioner of a reserve (claimed to be a foreign contingency reserve, but designated as a foreign exchange reserve on its balance sheets), which it had set up each year. The amount of such reserve for 1936 is $3,150,000.00 and for each of the other three years involved is $2,870,000.00. The testimony shows that this arose by reason of conditions in Germany and to revaluate appellant's assets. In 1932 appellant's investment in the German company, of which it owned 80% of the stock, was $3,848,940.77. The customers' accounts re-

ceivable of the German company at that time amounted to $2,649,412.00, many of which were in arrears, and the agents' accounts amounted to about one-half million dollars. Appellant reduced its stated capital $17,000,000.00, which was set up as a capital surplus and charged against the capital surplus $3,150,000.00 to write down its investment in Germany. No foreign exchange fluctuation was charged against this reserve. $280,000.00 of said reserve were used in 1936 to write off appellant's investment in its Spanish subsidiary. In view of the undisputed evidence as to the purpose of said reserve for each of the years in question the Board finds the same to be a proper and reasonable reserve and it should be deducted from the book value of appellant's assets. In this the tax commissioner is reversed.

7. The next ·claimed error is the disallowance of a reserve for Japanese patents. The amount of this reserve in 1935 was $118,406.17 and in each of the years 1936, 1937 and 1938 was $143,850.00. The evidence shows that in 1935 there was a merger of appellant's subsidiary in Japan with a Japanese owned company, appellant becoming owner of 70% of the capital stock of the merged company. The merged company obtained the license to manufacture registers under appellant's patents and carried the value of such patent rights at 500,000 yen. Appellant carried its investment in such company on its book at 70% of the book vaule of such merged company, which included the value of the patent rights, 70% of such value being $143,850.00. Appellant carried its own patents on its books at $1.00 and states that to offset the $143,-850.00 of the book value of its Japanese investment it set up $143,850.00 as a reserve in each year except in 1935 when there were other offsetting items. The investment of appellant in the Japanese company was valued by it at 70% of the value· of such company as carried on the books of such company. In the Japanese company's book value of its net worth were included the patent rights which it determined to be an asset and to be of the value of 500,000 yen. There is nothing in the record to show that by reason of that fact the book value of the property of the Japanese company exceeded the fair value thereof. The fact that appellant determined that its patents were valueless to it could not affect the value of the patent rights to the Japanese company, which determined that they were worth 500,000 yen. Without these patent rights the Japanese company could not have manufactured registers covered by such patents, and naturally the patent· rights would be worth more to the Japanese company than the patents were

to the appellant. It was proper, therefore, for the Japanese company to include the value as part of its assets and there is no proof that such value as determined by the Japanese company, the directing officials of which were very likely controlled by appellant, was more than the fair value thereof. The Board is of the opinion that the tax commissioner was correct in disallowing said item as a reserve and his action in this respect is affirmed.

8. In its return for the year 1939 appellant set up a reserve of $460,600.00 designated as Berlin dividends, which the tax commissioner disallowed as a deduction in determining its net worth. The evidence shows that in each of the years 1935, 1936, 1937 and 1938 a dividend was declared by the German company on the stock held by appellant in the sum of $115,150.00, which appellant set up as a foreign investment; and in 1938 the sum of $460,600.00 was set up as a reserve to offset that amount as a part of its assets as the amount thus due from the German company was considered worthless. No part of such dividends was ever paid as it was no longer possible to withdraw any funds from Germany. The Board' is of the opinion that under such circumstances such amount is a proper and reasonable reserve and should be deducted from its net worth, and in this respect the action of the tax commissioner is reversed.

9. Appellant also claims in its notice of appeal that the tax commissioner erred in his determination of the value of business done in Ohio. Appellant returned as the value of its business done in Ohio the sum of $4,725,562.86 for the year 1936, $6,205,887.39 for the year 1937, $7,144,776.79 for the year 1938 and $6,243,414.01 for the year 1939; whereas the tax commissioner determined that of the total amount of the entire business transacted everywhere the value of such business done in Ohio was $13,830,116.00, $17,375,035.00 for the year 1937, $20,282,304.00 for the year 1938 and $15,980,447.00 for the year 1939. Appellant apparently has abandoned this claimed error since its reply brief states the tax commissioner's allocation of appellant's business as between Ohio and elsewhere is not in dispute. All of the property sold by appellant was manufactured in Ohio. Its operations, therefore, constituted the doing of business in Ohio wherever the products so manufactured may have been sold. America Manufacturing Company v St Louis, 250 U. S. 459, 63 L. Ed. 1084; **Aluminum Company of America v Evatt, 140 Oh St 385, 45 N. E. (2) 118.** It follows, therefore, that the action of the tax commissioner

in this respect could not be prejudicial to the appellant and the same is affirmed.

It is, therefore, considered and adjudged that the action of the tax commissioner herein complained of be modified in the respects herein above set forth and as modified the same hereby is affirmed.

BOARD OF TAX APPEALS.